# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CARL J. BARTON, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 13-554 |
| | ) | |
| v. | ) | Judge Cathy Bissoon |
| | ) | |
| HEWLETT-PACKARD COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

### I. MEMORANDUM

Plaintiff Carl J. Barton ("Plaintiff") filed the instant lawsuit in the Court of Common Pleas of Allegheny County asserting a breach of contract action under Pennsylvania law for failure to pay incentive compensation. (Doc. 1-2). Defendant Hewlett-Packard Company ("Defendant"), properly removed the case to federal court on the basis of diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1). (Doc. 1). Presently pending before the Court is the Defendant's Motion for Summary Judgment (Doc. 19), which, for the reasons stated below, will be granted.

*A. Background*[1]

Defendant is a global technology company that provides a full array of technology-related products and services, including information technology and enterprise software. (Doc.

---

[1] The factual background is derived from the undisputed evidence of record and the disputed evidence of record viewed in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.").

36 at ¶ 1).² Plaintiff began working for Vertica Systems, Inc. ("Vertica"), an analytical database software company, in February 2011 as a sales representative, and his territory included several Midwestern states, including Michigan. (*Id.* at ¶¶1-2). Shortly thereafter, Defendant acquired Vertica, and Plaintiff became a salesperson for Defendant assigned to the same Midwestern territory. (*Id.* at ¶ 3).

Plaintiff was issued a "Sales Letter" at the end of April 2012, effective February 1, 2012, which set forth the parameters upon which his incentive compensation calculation would be based. (Doc. 22-1 at p. 2; Doc. 36 at ¶ 5). Plaintiff's prorated quota for fiscal year 2012 was $1.3 million. (Doc. 22-1 at p. 2; Doc. 36 at ¶ 7). Plaintiff's quota was set based on a multitude of factors, including an analysis of what had been sold in the territory previously, what his "pipeline" looked like, and his skill set. (Doc. 36 at ¶ 7). If Plaintiff matched his quota, he would be paid a 6.52% base commission rate up to the quota amount, resulting in a sales commission of approximately $84,760. (*Id.* at ¶ 8). Plaintiff's Sales Letter also included accelerated commission rates, ranging from 7.82% to 18.25% if he exceeded his quota amount. (*Id.* at ¶ 9).

Plaintiff's Sales Letter expressly incorporated, through an electronic link, Defendant's Global Sales Compensation Policy, which stated, *inter alia*:

> HP reserves the right to adjust or cancel the terms of Sales plans, or Sales letters with or without notice at any time, including but not limited to adjusting accounts, goals/quotas, target incentive amount (TIA) or to address changing or unforeseen business conditions or to correct administrative errors. HP also reserves the right to change or discontinue this Policy, with or without notice, at any time.

(Doc. 22-1 at p. 3; Doc. 22-2 at p. 6). Plaintiff's Sales Letter contained similar language:

---

²Unless otherwise noted, Defendant's Reply to Plaintiff's Responsive Concise Statement of Material Facts (Doc. 36) is relied upon only to the extent the facts are undisputed by the Plaintiff.

> HP reserves the right to adjust the terms of the Sales Plan or to cancel at any time. To the extent allowed by law, the various components of your compensation are subject to change in accordance with the governing policies described above.

(Doc. 22-1 at p. 4).

Defendant's Global Sales Compensation Policy included a Management Incentive Performance Review ("MIPR") policy. (Doc. 22-2 at p. 22). The stated purpose of this policy was "to evaluate Sales employee performance significantly above quota or for the evaluation of credit for 'large' deals." (Doc. 22-2 at p. 22). The MIPR provided, in pertinent part that:

> [A] management review may occur for large transactions, including groups of related transactions. The Sales employee should have no expectation of receiving incentive payments in connection with these large transactions where the credit is disproportionate to the employee's assigned quota or to the employee's contribution toward the sales transactions, as determined in the sole discretion of HP. …

(*Id.*). Plaintiff's Sales Letter tracked this policy language, stating:

> HP reserves the right to review and in its sole discretion adjust incentive payments associated with large transactions for which the incentive payments are disproportionate when compared with the employee's assigned quota or contribution toward the transactions.

(Doc. 22-1 at p. 3). It is the Defendant's application of the MIPR policy that is the crux of the instant dispute.

Included within Plaintiff's Midwestern sales territory was General Motors Corporation ("GM"). (Doc. 36 at ¶ 20). In April 2011, Plaintiff met with certain GM employees to set up a "proof of concept" ("POC") to show those employees how Vertica software worked. (*Id.* at ¶ 22). Plaintiff indicated that from April 2011 through April 2012, he communicated with GM employees numerous times in person, over the telephone, and by email attempting to promote Vertica software and services to GM. (*Id.* at ¶ 23). In early March 2012, Plaintiff forecasted approximately $1,000,000 in sales to GM for fiscal year 2012. (*Id.* at ¶ 26). Around this same

3

time frame, Plaintiff was planning a meeting at GM and asked Colin Mahony ("Mahony"), the General Manager of Vertica, to make a presentation to GM with respect to Vertica's capabilities. (*Id.* at ¶¶ 27-28; Doc. 22-15 at p. 9). Michael Barton ("Barton") (no relation), Plaintiff's immediate supervisor, thought the meeting was important because it was with decisionmakers, and a chance for Vertica to "move beyond sort of education to maybe really doing a transaction." (Doc. 36 at ¶ 29). Plaintiff was of the view that he was "ready to close a deal at General Motors." (Doc. 30-7 at p. 6, Mahony Dep. at p. 54). Mahony, however, had a different view following the GM presentation, and testified that after leaving the meeting he felt "there was [no] opportunity there" and that the meeting had been a waste of his time. (Doc. 22-15 at pp. 10, 14).

Historically, GM had a contractual relationship with Electronic Data Systems Corporation ("EDS") to perform a wide array of services to address GM's information technology ("IT") needs. (Doc. 36 at ¶ 36). Following its acquisition of EDS in 2008, Defendant continued to provide IT services to GM. (*Id.*). Randy Mott ("Mott") was Defendant's Chief Information Officer ("CIO") until he left this position and became GM's CIO in February 2012. (*Id.* at 34). In late March 2012, Mott decided to terminate Defendant's IT contract with GM, and informed Defendant's senior executives of this at a meeting on March 26, 2012. (*Id.* at ¶ 39). At this same meeting, Mott announced that as part of its insourcing strategy, GM proposed to buy Defendant's entire suite of software products. (*Id.* at ¶ 40). Mott proposed a five-year, unlimited enterprise-wide licensing agreement ("ELA") for these software products, which allowed a customer to use the software anywhere and to store unlimited amounts of information. (*Id.*). Vertica was included among the list of software products in GM's initial offer. (*Id.* at ¶ 44). After learning of the ELA possibility from Mott, Defendant instructed all

4

individual software salespersons, including Plaintiff, to stop their individual sales efforts at GM so as to not interfere with the ELA negotiations. (*Id.* at ¶ 53).

Defendant subsequently formed a team to negotiate an ELA with GM executives. (*Id.* at ¶ 41). The lead negotiator for Defendant was Dan Stoks ("Stoks"), its software field sales leader for the Americas, assisted by Todd Rotger ("Rotger"), the GM Global Account Manager, Jon Stevenson ("Stevenson"), Rotger's supervisor, Rob Hughes ("Hughes"), the GM Account General Manager, and Bill Veghte ("Veghte") and George Kadifa ("Kadifa"), who were corporate vice presidents in charge of Defendant's software during different portions of fiscal year 2012. (*Id.* at ¶¶ 42-43). It is undisputed that Plaintiff was not a part of the ELA negotiation team, nor did he ever have any interaction with Mott, the GM decision-maker. (*Id.* at ¶¶ 54-55).

On April 17, 2012, Plaintiff was asked by Rotger to quote a price for Vertica software to be included in the ELA transaction with GM. (Doc. 30-9 at ¶ 8). According to Plaintiff, he reached out to his sales management team, including Barton, Mahony, and Ed Fillipine ("Filippine") regarding the "pricing and structuring" of the deal. (*Id.* at ¶ 12). Following ongoing discussions with the sales management team, Plaintiff was of the view that he developed the pricing model that was ultimately utilized by the ELA negotiation team, resulting in an additional $6.2 million in revenue for Defendant. (*Id.* at ¶¶ 28-29).

Defendant and GM ultimately entered into an across-the-board software ELA with GM, with the Vertica software priced at $8.28 million. (Doc. 36 at ¶ 52). The GM ELA was one of the largest, if not the largest, deal in Defendant's software history. (*Id.* at ¶ 59). It is undisputed that the $8.28 million sale of Vertica was the largest sale of Vertica software at that time, and Plaintiff does not dispute that it was a "large transaction." (*Id.* at ¶¶ 59-60). It is further undisputed that Defendant invoked the MIPR policy in order to determine how much sales

5

commissions would be paid to salespersons who had GM in their sales territory. According to Defendant, the decision was made to invoke the MIPR policy due to the unique nature of the ELA transaction. (Doc. 22-19 at pp. 18, 23).

On November 2, 2012, Hans-Peter Klaey ("Klaey"), Defendant's global field sales leader, notified Defendant's sales force that it would apply its MIPR policy. (Doc. 22-7 at p. 2). Klaey, along with, *inter alia*, Kadifa and Mahony, were part of a team tasked with developing the criteria for the incentive pay. (Doc. 22-19 at pp. 18-19). Klaey's email stated, in pertinent part:

> GM's business decision was unexpected and occurred after the annual account planning and quota deployment lockdown date. As a result, although the strategic shift in GM's model resulted in a significant benefit to HP Software overall, HP Software was not able to deploy quota for the FY12 year-end large transaction.
>
> HP Software is fully committed to rewarding our Sales employees for the business they generate through customer engagement and activities. A management incentive performance review (MIPR) is being conducted for this transaction to determine the appropriate manner of handling this large transaction. As part of its evaluation, HP Software must determine appropriate revenue recognition.
>
> For those employees who have made an extensive contribution to the deal, a separate communication will be sent by mid-November, after all internal and external reviews have been concluded, for the large transaction payment criteria and details. Obviously, in making its determinations, HP will adhere to the policy that incentive payments will not be provided in connection with large transactions where the credit is disproportionate to an employee's assigned quota or to an employee's contribution toward the sales transaction.

(Doc. 22-7 at p. 2).

Ultimately, Defendant made the decision to compensate its salespersons for the GM ELA deal, but to not pay accelerated commission rates for the total revenue for the deal. (Doc. 22-9 at pp. 2-4). Plaintiff was paid for the Vertica sale at his base commission rate of 6.52%, resulting in a commission payment of $539,452.28. (Doc. 36 at ¶ 71). Plaintiff, however, was of the view

6

that he should have been paid at his accelerated commission rate, resulting in a commission payment of $1,273,019.82, or, $733,477.54 more than he was actually paid. (*Id.* at 80; Doc. 1-2 at ¶ 72). Plaintiff disputed his commission payment when he received his commission statement on November 27, 2012, and Plaintiff was informed that the payout would be at his base commission rate. (Doc. 36 at ¶ 76). Defendant offered Plaintiff the opportunity to submit additional information in support of his contention that he should be compensated at the accelerated rates, and Plaintiff did submit additional documentation, but Defendant adhered to its decision. (*Id.* at ¶¶ 78-79). Mahony informed Plaintiff that Defendant "did not find anything to create an exception to the broad and consistent HP Software application of terms and conditions on the GM deal so this will not change." (*Id.* at ¶ 79). Plaintiff subsequently resigned in March 2012 and brought the instant lawsuit seeking to recover $733,477.54 in unpaid sales commissions. (*Id.* at ¶ 80).

Defendant argues that summary judgment is appropriate because the Sales Letter did not constitute an enforceable contract between the parties. (Doc. 20 at pp. 15-19). Alternatively, Defendant argues that even if the Sales Letter is a contract, there is no genuine issue that it did not act in bad faith in exercising its sole discretion to adjust sales commissions as set forth in the agreement. (*Id.* at pp. 19-29).

## B. Analysis

In order to prevail on a breach of contract claim under Pennsylvania law, a plaintiff must establish "(1) the existence of a contract, including its essential terms; (2) a breach of duty imposed by the contract; and (3) resulting damages." *Lackner v. Glosser*, 892 A.2d 21, 30 (Pa. Super. 2006); *see also Amerex Environmental Technologies, Inc. v. Foster*, 2012 WL 6552828 at *3 (W.D.Pa. 2012). The elements of an enforceable contract are: (1) a manifestation of an intent

7

to be bound by the terms of the agreement; (2) sufficiently definite terms; and (3) an agreement supported by adequate consideration. *Legendary Art, LLC v. Godard*, 888 F. Supp. 2d 577, 585 (E.D.Pa. 2012); *see also Johnston the Florist, Inc. v. Tedco Constr. Corp.*, 657 A.2d 511, 516 (Pa. Super. 1995).

Defendant first argues that no enforceable contract exists because the plain language of the purported contract demonstrates that it did not manifest an intent to be bound. (Doc. 20 at pp. 16-18). "In ascertaining the intent of the parties to a contract, it is their outward and objective manifestations of assent, as opposed to their undisclosed and subjective intentions, that matter." *California Sun Tanning USA, Inc. v. Electric Beach, Inc.*, 369 F. App'x 340, 346-47 (3d Cir. 2010) (quoting *Espenshade v. Espenshade*, 729 A.2d 1239, 1243 (Pa. Super. 1999)).

Here, as previously stated, the Sales Letter explicitly provided that Defendant reserved the right "to adjust the terms of the Sales Plan or to cancel at any time." (Doc. 22-1 at p. 4). The Sales Letter further incorporated, through an electronic link, the Defendant's compensation policy, which included more expansive language, explaining that it reserved the right to, *inter alia*, adjust or cancel the terms of the Sales Letters, with or without notice at any time, and further reserved the right to change or discontinue the compensation policy, with or without notice, at any time. (Doc. 22-1 at p. 3; Doc. 22-2 at p. 6). Objectively viewed, this language, explicitly included and/or incorporated in the Sales Letter, simply does not evidence an intent by the Defendant to be bound and Plaintiff could not reasonably believe otherwise.

Moreover, as Defendant points out, other courts have held as a matter of law that a compensation or bonus plan does not create an enforceable contract if the language of the plan specifically provides that an employer reserves the right to modify or terminate the plan at any time. For example, in *Geras v. Int'l Bus. Mach. Corp.*, 638 F.3d 1311, 1316-17 (10th Cir. 2011),

the Court of Appeals for the Tenth Circuit rejected a sales representative's breach of contract claim for commission payments based on the defendant's incentive letter. The court held that although the letter contained a description of defendant's policies, including its policies for adjusting payments, defendant "retained the discretion to alter or cancel these policies" and it could not reasonably be construed to be a binding promise. *Geras*, 638 F.3d at 1317.[3] *See also, Kavitz v. Int'l Bus. Mach. Corp.*, 458 F. App'x 18, 20 (2nd Cir. 2012) ("Even if we had any doubt on this point (and we do not), that IBM retained unfettered discretion under the Plan to adjust its terms even to cancel the Plan entirely confirms that the document is not an enforceable contract."); *Rakos v. Skytel Corp.*, 954 F. Supp. 1234, 1237 (N.D.Ill. 1996) (finding that an executive compensation plan did not create an enforceable contract as a matter of law because it did not contain a clear right to bonus commissions since "[d]efendant clearly retained the right to modify or cancel the Plan at any time without prior notice. Such a statement is an effective disclaimer to negate any possible promissory intent."); *Bahr v. Technical Consumer Products, Inc.*, 2014 WL 1094426 at *8 (N.D.Ohio 2014) ("Cases from [various] jurisdictions generally reinforce the conclusion that contract formation does not occur when an employer retains absolute discretion or a unilateral right to modify or cancel employee commission.") (quoting *Schwarzkopf v. Int'l Bus. Mach., Inc.*, 2010 WL 1929625 at *8 (N.D.Cal. 2010) (collecting cases finding no enforceable unilateral contract)); *Cf. Herbst v. Gen. Acc. Ins. Co.*, 1999 WL 820194 at *8 (E.D.Pa. 1999) (holding that no contract of employment existed where the memorandum describing the incentive program made clear that the payment of bonuses was discretionary and the employer retained the discretion to unilaterally revise or cancel the program).

---

[3] The Court recognizes that the commission plan at issue in *Geras* also included contractual disclaimer language. However, the Tenth Circuit specifically did not rely on the disclaimer language in concluding there was no contract. *Geras*, 638 F.3d at 1316 (declining to decide how the Colorado Supreme Court would resolve the contractual disclaimer language).

Plaintiff does not address or otherwise attempt to distinguish the above authorities. Rather, he first argues that the record is devoid of evidence that Defendant did not intend to be bound by the Sales Letter. (Doc. 31 at p. 16). As the preceding authorities demonstrate, however, such intent is reflected in the <u>explicit</u> language of the Sales Letter. Plaintiff further claims that a contractual obligation was created because the Sales Letter contains "formal language" and "mandatory prose." (*Id.* at p. 16). A similar argument was advanced by the plaintiff in *Rakos,* who argued that the mandatory language in the plan stating that a bonus "will" be paid based on performance conflicted with the defendant's right to review unique large orders and determine whether a bonus would be paid. *Rakos*, 954 F. Supp. at 1238. That court rejected that argument, finding that "[t]he Plan in its entirety must be analyzed and it merely says that an employee will be paid bonuses unless defendant decides otherwise." *Id.*

Plaintiff further argues that because he and his supervisor Barton signed the Sales Letter, this signified a formality consistent with an intention to be bound. (Doc. 31 at pp. 16-17). However, "[s]ignatures are not dispositive evidence of contractual intent. *American Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 584 (3d Cir. 2009) (citing *Commerce Bank/Pennsylvania v. First Union Nat'l Bank*, 911 A.2d 133, 145-46 (Pa. Super. 2006)); *Maule v. Philadelphia Media Holdings, LLC*, 2010 WL 914926 at *8 (E.D.Pa. 2010) (rejecting argument that signature on the agreement demonstrated the party was a contracting party and holding instead that the intent of the parties controlled).

Moreover, Defendant's right to adjust or cancel the sales plan at any time without notice further renders the Sales Letter unenforceable for lack of consideration. "If the promise is entirely optional with the promisor, it is illusory, lacks consideration, and is unenforceable." *Lackner*, 892 A.2d at 31 (citing *Geisinger Clinic v. Di Cuccio*, 606 A.2d 509, 512 (Pa. Super.

10

1992), *appeal denied*, 637 A.2d 282 (1993)). In *Don-Rick, Inc. v. QBE Americas*, 995 F. Supp. 2d 863, 871 (W.D.Wis. 2014), the district court reviewed a similar sales compensation plan, and concluded that because the program provided the defendant with total discretion to cancel the program at any time up until such payments were actually made, all that resulted was an unenforceable illusory contract and plaintiff's alleged performance could not change the result. *See also Rumble v. Convergys*, 2010 WL 812775 at *17 (S.D.Ohio 2010) (holding that because the defendant retained unrestrained discretion to amend, cancel, and alter the effect of the incentive plan, such discretion "render[ed] the incentive compensation illusory and unenforceable").

Here, Defendant allegedly entered into an agreement with Plaintiff for the payment of incentive compensation while retaining the discretion to cancel the plan at any time for any reason. Plaintiff's efforts to inject the general duty of good faith and fair dealing in the performance of a contract is inapposite at this stage because there must first be an enforceable contract before the duty applies. *See Novinger Group, Inc. v. Hartford Ins., Inc.*, 514 F. Supp. 2d 662, 671 (M.D.Pa. 2007) ("the duty of good faith and fair dealing does not extend to issues of contract formation"); *Falbo v. State Farm Life Ins. Co.*, 1997 WL 116988 at *7 (E.D.Pa. 1997) (holding that the duty of good faith and fair dealing cannot arise until the contract has been formed and will not provide protection in the formation process of the contract).

In short, the Sales Letter is not an enforceable contract and Plaintiff's action for breach of contract cannot survive summary judgment as a matter of law. In light of the Court's conclusion that Defendant's incentive compensation plan did not create an enforceable contract, we need not address Plaintiff's argument that Defendant did not act reasonably or in good faith when it refused to pay Plaintiff the accelerated commission rates.

11

## II. ORDER

For the reasons stated above, Defendant's Motion for Summary Judgment (**Doc. 19**) is **GRANTED**.

IT IS SO ORDERED.


December 9, 2014											s/Cathy Bissoon
												Cathy Bissoon
												United States District Judge


cc (via ECF email notification):

All Counsel of Record